We'll move to the fourth argument of the day. Number 183565 McDaniel v. Progress Rail Locomotive. Mr. Sweeney, whenever you're ready. May it please the Court. Your Honors, today I represent the plaintiff in this case, David McDaniel. Mr. McDaniel was a laborer who brought an action against Progress Rail, the defendant, for violations of the Age Discrimination and Employment Act and for retaliation. Those are the two issues. He did have one state law claim, which we are not pursuing on appeal. The issues before the Court are essentially whether or not the District Court applied a, what is essentially a mechanized or ritualistic analysis of the facts and law in order to reach the conclusion that summary judgment should have been granted and whether he appropriately viewed the facts in light most favorable to the plaintiff. As we point out, and as this Court is well aware, back in 1978 when Justice Rehnquist issued the Fernco Construction Corp. v. Waters case, which was the first time they were looking at whether or not a plaintiff could show the demographic of an employment force as evidence of discriminatory conduct, the Supreme Court looked at the issue and said the method suggested in McDaniel-Douglas was never intended to be rigid, mechanized, or ritualistic, and it allowed that evidence then to be used, and it further allowed the defendant to pursue additional evidence, which the District Court and the Appellate Court thought should not be used in a discrimination case. This Court has specifically come back since that time and acknowledged that employment discrimination may manifest itself in many different forms, and this Court has required District Courts to tailor the elements of a prima facie case to fit the context of the unique situation. Mr. Sweeney, do you agree that in presenting your case that you need to provide evidence of similarly situated employees who were treated differently? I think one must look at, as this Court said in Cracknevy, the unique situation. So, yes, I would say we would want to do that. My question was a little bit different. In order to succeed on your claim, do you need to identify similarly situated employees who were treated differently? So, that being the fourth element of the indirect method, this Court has specifically said, so the answer is no, I don't think so. I think one must tailor the elements of a prima facie case to fit the context of the unique situation. How do you get around that given our case law? How do you get around proving that particular element given our case law, especially using the indirect method? I think there's two things at work. One, I think we did. I think we did sufficiently provide comparison. And that's a factual issue that I'll get to in a moment. I'm just trying to understand legally where you're coming from if you think that is a necessary element, which you've said no. And now, legally, putting aside the facts, but legally, how do you get around our case law? Well, let's assume that you've got a situation where you don't have a comparator. Does that mean that that person can't be discriminated against? No. So, in that case, we're going to admit that the situation has to be tailored. It has to be unique to that situation. What about a situation, let's say, like this one, where we've got an individual who is subjected over the course of 45 days to incidents that are so off the chart in terms of the conduct that one would normally expect in the workplace that you say, okay, is there any other younger employee who was subjected to three separate false accusations of using his phone, of claiming that he wasn't medically capable of going to work, of then being sent out to sweep a factory floor for three weeks? Each of which was proven false. So we've got a supervisor who comes in the day after he's accused of ageist action. The next day, accusing someone of using his phone. Now, Mr. McDaniel is a laborer. He doesn't have a computer. He doesn't have a printer. But he knew this was wrong. So he goes to his cell phone carrier for two days until he can get his bill, which shows his phone usage. He brings that back to show his supervisor's supervisor that he wasn't using his phone on the day he was accused of it. They said he was on the phone talking to his son. So he brings it in, shows it to his supervisor, who says, Mr. Howard, how do you explain this? He says he wasn't using his phone. And he's got proof that he didn't. But he did admit that he had his phone out on the machinery, which was a violation of the policy. Whether he was using it or not is separate. He did admit he had it and it was out on the machinery. But that was not, we're not saying here that the fact that he had the phone out doesn't justify someone saying something for a write-up. But that issue never got to the Investigatory Committee. It never got to the Disciplinary Committee because they said the day after he made an ageist-related allegation, his boss comes in and says, you were on the phone with your son. He comes in and proves he wasn't on the phone with his son. They say, well, maybe you were texting. He says, I wasn't accused of texting. Three days later, he's accused of taking photos on the factory floor. They come down right up behind him and say, were you taking photos of the factory floor? He says, no. Give him my phone. He gives him the phone. They look at the phone. There's no photos of the factory floor. The supervisor's supervisor says there's no evidence. So what does that supervisor, Mr. Howard, do again? He moves the goalposts again, not texting the first time. Now he says he's not as productive as the other employees, which is similar to the accusation that Mr. McDaniel made originally, saying that the younger employees were more productive than he was, and they order an audit to see whether or not he's done as much work as the other employees. He has. Mr. Sweeney, is the defendant right that The zone in on here is this. Was there anyone younger than the plaintiff who violated the lifting restriction or some other serious safety rule that was treated better than Mr. McDaniel? So what we would say to that is we don't know, but we protest the fact that there was a violation in the first place. And we say you've got to look at each one of these acts in context. This is a mosaic. You can't just say, okay, in August you complained of an age-related comment. In February you lifted something which physically a 56-year-old with a back problem leaning over a three-foot crate to lift a 106-pound greasy stainless steel locomotive gear so that he could pull a plastic bag out with his other hand. That is not feasible. I would challenge anyone who's the greatest athletes we have in the world to perform that act and see if they could do it. The problem, however, is that, I mean, I understand that Mr. McDaniel insists that he didn't lift the object that crushed his finger, but did he not repeatedly use the word lift himself to describe the incident? And not just on the day of the incident, but in subsequent statements? Mr. McDaniel did use the word lift. We would suggest that when one describes the situation as to what he did, to lift a 106-pound stainless steel greased-up gear inside the crate and then with the other arm pull out a plastic bag which was underneath it, he didn't lift it. He shifted it. But that's beside the point. I think— No, that's not beside the point. Well, I think— It's just beside the point. The point is, sadly, whatever transpired there, he used the word lift in the hospital. He used the word lift that day. He used the word lift in a depository. He used that word. I would suggest that even if he did use that word, if we look at this, at least let's look at it from the retaliation context. We've got a supervisor who takes clear action against the plaintiff for the 45 days after this claim by the plaintiff that he's not receiving overtime because he's older than the other members of his team. And then when that supervisor is unsuccessful in getting him terminated, he then uses that language as sort of a magic word, which the plaintiff in this case is not. You would never say that Mr. McDaniel is someone who uses his words with an eye towards litigation. But lift isn't a particularly sophisticated word, and he said it in the context when he was being treated medically. He said it in the medical office while they had him in the office. They would not send him to the hospital. His finger was bleeding, and he's sitting there while the president of the factory comes down and starts asking him questions. He's like, is the ambulance here? For an hour and a half he sat there and answered questions. Wasn't this all looked at by the safety committee looked at all this, right, and said it was a safety violation? That's a great point because what the safety committee looked at, and this goes to the cat spot theory, what the safety committee looked at were the reprimands, written reprimands that Mr. McDaniel received back in 2009. But your client, Mr. McDaniel, he was able to present his case to the committee. In fact, didn't he have a union rep there? He never actually spoke to the committee. There was no means at all through which he could have submitted his side of the story? Jonathan Howard. I know what Howard did, but I thought your client was able to submit his side of the story. Jonathan Howard asked questions. Jonathan Howard conducted the investigatory interview, wrote down what questions he asked, wrote down what he said the answers were, and he conducted the disciplinary hearing, which occurred at the exact same time. I get Howard. Focus on the committee. The committee said all we want to do is hear from Howard. We could care less what Mr. McDaniel says. They never got to the committee. He never spoke to the committee. Did he have the opportunity to through his union rep? But he just didn't do it. The only thing I think he could do is make some sort of presentation through the investigatory interview with Howard, which then gets relayed to the safety committee. But the safety committee, what they looked at, their policy says we will not look at a reprimand that's more than 24 months old. They looked at four reprimands that he received nine years ago and used those in addition to counseling, which nobody knows about, in August of 2016 because he couldn't get out of his chair one day because his back seized up. Is the defendant right on this point, Mr. Sweeney, that after Mr. Howard was terminated, that he was replaced by an employee that was older than him, Pinto or Delfino? Is that factually accurate? I think it's hard to say. No, no, no. What's the record show? Well, I mean, it's not a flu. It's not a situation where we've got, you know, S-15 material handler McDaniel replaced by S-15 material handler Pinto. Did Pinto or Delfino join the same group after your client was terminated? I believe so. And is Pinto or Delfino older or younger than your client? What's the record show? I think they're of the same vintage. It shows he's older, doesn't it? I don't think that's a true question. Well, he's 56. I think Mr. Delfino is, what, 60? Maybe they're close in age, but Mr. Delfino is older. I would also say, at the same time, they were already on notice that there was a potential age claim. I have one final question about what happened in the district court, okay? Sure. You make the point, and pushing back on resistance that you're getting, you're hearing some of the questions today. You make the point that Mr. McDaniel offered evidence of eight younger employees working in the same group, answered to the same decisions, and none of them were subjected to anything close to the course of events that your client experienced. That's on page 40 of your brief, the blue brief. You make a similar comment on page 30. But it's unaccompanied by any specific references to the record. So I don't know, as I sit here today, who are the eight employees? What are their names? What jobs did they have? What did they experience? So we're not going to find it in the briefs. My question for you is, is that in the record? I'll cite the court to page 3 of our brief where we say, McDaniel was hired by Progress Rail as an S-15 specialist material, it doesn't say handler, but material handler, commonly referred to as a material handler in June of 2005. All material handlers, and that cites the record twice, all material handlers responsible for unloading materials. The reason I'm focused on the eight younger employees is because that gets to the comparator's question. And so what I was hoping to do is go from your brief into the record and read about the eight people. So what we do go on to say there is down below, we lay out, and this is taken directly from Progress Rail's roles and responsibilities for material handlers. We list that information on page 3. We cite to the record paragraph 45, paragraph 33. We then go on to say that Mr. Howard was the direct supervisor of a team of nine total material handlers. Throughout the time when Howard was McDaniel's direct supervisor, McDaniel was the oldest and most senior material handler working in the group. The cases that the defendant has cited are cases where someone, say, like for instance, one case where someone says, I didn't get promoted and they list 37 names of individuals. They don't give what those people's positions were. Are you back to your point that you don't need to identify comparators? Because I think Judge Scudder's point is, did you specifically identify these comparators to the district court by name, age, job description, supervisor, or is there anything more than eight younger people specified in the record? Because I couldn't find it either. No, what we cited too, and we would say that the names are not relevant. The fact that there are nine material handlers in the group, we lay out exactly what their roles and responsibilities are, that they are all supervised by Mr. Howard and have been for a period of three years. The fact that you don't know one's name is John. Oh, I don't know. That's where the legal ice gets thin for you. We've got case law. You've got case law that says. I mean, I'm looking right at it from a year ago. The Skiba case talks about the plaintiff putting together a table and listing 37 people by name, age, responsibility. It does not list responsibility, I thought. I thought it just gave the names of 37 people that did not receive promotions. The court could not decide. So are the eight here and what went on with them? Is it somewhere in the record? The eight were never treated. The eight were never treated. So to Judge Eaves, Never treated? I'm sorry. The eight were never treated in the same way as the plaintiff. But what we're pointing out is it would be impossible for us to take a comparator and say, okay, you made an age-related claim against your supervisor on day one. This comparator was not subject to a false allegation of phone usage on day two. That comparator was not subject to a false allegation of phone usage on day five. Your time's up. We need to get to your colleague on the other side. Thank you very much. Mr. Schenberg? Yes, sir. May it please the court, Plaintiff told Progress Rail that he manually lifted a piece of heavy equipment. Without dispute, manually lifting a piece of heavy equipment violates the company's safety rules, and that's why he lost his job. A plaintiff has alleged a different explanation for his termination, but allegations are not evidence, and the key question before the court today is whether or not the plaintiff has any evidence to support his allegations that age discrimination or retaliation were the but-for cause of his termination. He doesn't. The termination decision was made by the safety committee. There is no evidence the safety committee even knew of an age-related complaint, and without knowledge of protected activity, the safety committee cannot have been motivated to retaliate. There's also no evidence that anyone on the safety committee was age-biased, and as the district court strongly pointed out, plaintiff offered no evidence that the safety committee treated plaintiff differently than they treated anyone else who violated safety rules. The evidence shows that the safety committee made its decision based on the plaintiff's violation of the lifting policy. There is the uncontradicted affidavit of the committee head, Mr. Ledger, saying exactly that. The committee had plaintiffs' written admission that he had lifted the heavy equipment. The committee had plaintiffs' admission to safety committee member, Tony Wings, who's also the plant manager, that he was in a hurry and he lifted the equipment. The notes of plaintiff's statements during his investigatory interviews are also consistent with the written admission, and the safety committee knew that committee head, Mr. Ledger, had previously counseled plaintiff about the lifting rules. Now, in response, plaintiff has four arguments in his briefs. First, plaintiff says the safety committee was merely the cat's paw of his direct supervisor, Mr. Howard, but the cat's paw theory only applies when the decision maker doesn't conduct its own investigation and it instead completely and blindly relies on a subordinate who has influenced the decision with false information. There's none of that. What's the evidence that the safety committee did its own investigation? Well, the safety committee reviewed the materials that had been gathered, and they may have been gathered by Mr. Howard, but the point, I think, here is that the safety committee based its decision on the violation of the safety rules, and it didn't need to look any further than plaintiff's own admission that he had done that. Did the committee have before it anything other than what Mr. Howard had compiled? I don't know exactly the funnel to which it all got to the safety committee. It might be that Mr. Howard was the person who compiled it and put it together for them, but I think the point is that there was no opportunity, really, for Mr. Howard to have even influenced the decision. This wasn't in a subjective evaluation. Mr. Howard didn't witness the accident. He simply took plaintiff's written statement and moved it from here to here and said, here's what he says himself. The plaintiff himself said to one of the safety committee members, Mr. Wings, I was in a hurry, and I lifted it. So there's really no opportunity here for Mr. Did the plaintiff have an opportunity to tell the safety committee, look, this is all a sham? This is all age-related retaliation, and let me tell you why. I had a problem with the cell phone, and this is all because I'm older. Did he have that chance if he wanted to? There's nothing in the record to suggest that he did, and I'm not aware of whether the method allowed him to directly go forward. I would say that he did grieve his termination, and in his grievance, he took issue, as he did with the Illinois Department of Insecurity, he didn't take issue with the notion that he had lifted. He took notion with the fact that he had intended to do him any harm. In other words, he has told the same story consistently that he had lifted the material, and it was on that basis that the safety committee decided it. In other words, it's not Mr. Howard, the supervisor, who got him fired. It's his own words describing his own conduct that got him fired. And to the other point being, of course, and that's the cat's paw theory, but the other point being, of course, that there's just no evidence that any other safety violation was treated any differently. The plaintiff's second argument is to say, I misspoke. I didn't really mean it when I said that I lifted the shaft. But there's two problems with that argument, one of which is that he confirmed the accuracy of the written statement that he gave. This is the statement that his union rep wrote out for him and that he confirmed the deposition. He confirmed the accuracy of it. He also confirmed, again under oath to the Illinois Department of Employment Security, that he lifted the shaft because, again, he was in a hurry. And plaintiff can't defeat summary judgment by contradicting his own sworn testimony. Furthermore, and this gets to a point I think that judge- I'm sorry. Is the evidence that the statement that the union rep wrote out represented that he lifted? Yes. Or is that the one where he said- No, he says he lifted it. Okay. He says he lifted it. And I would also point out, and this is going to an earlier point that I think Judge Rovner was making, which was that, frankly, whether he actually lifted it or not is somewhat beside the point. That's the information that he gave to the safety committee. And if plaintiff misspoke and gave them false information, well, that doesn't say anything about the motives of the safety committee, who, again, couldn't have retaliated because they didn't know about any age complaint and there's no evidence anybody there was age biased. So the third thing that he says is that the committee improperly considered these stale disciplinary reports. Plaintiff has said that repeatedly, but there's nothing in the record to say that the safety committee looked at any stale disciplinary reports. I think Mr. Ledger's affidavit is really the report of what the safety committee considered. It doesn't say anything about that. It refers to counseling, which, A, is not a disciplinary report, and, B, was not stale because it had only occurred a few months later, and that was where the head of the safety committee had counseled plaintiff about these very same lifting rules. The fourth progress, plaintiff has said the progress rail didn't follow its own rules of progressive discipline. But the very policy he points to states right on its face that it may, depending on the seriousness in the judgment and discretion of management, it can impose any sanction it wishes up to and including termination. There's no requirement that it go through five steps before it fires someone for a serious safety violation. Plaintiff made a couple other claims to the district court. I would like to touch on them briefly. He claimed that it was a one-day suspension, and that that violated the ADEA. That claim also fails. The plaintiff presented the district court no authority that the one-day suspension could be a material adverse action, nor did he distinguish or in any way address progress rail's authority on that point. Even if it was an adverse action, he presented no evidence that the reason for the one-day suspension was discrimination or retaliation. He admitted in writing twice that he was violating the rules, and he gave two different explanations, both of which amount to violations. In a written statement, he said that he had been using the phone to check the time in the aisle. That violates the rule. He also had said that he had it out on top of his forklift, which also violates the rule. No evidence, again, that any similarly situated employees are known to have engaged in a similar rule violation, but were treated more favorably. The district court cited this court's opinion in Johnson v. Advocate Health, which under similar circumstances held that such an unsupported argument would be waived. Here, the district court actually went on its own, which it didn't have to do, searching through the record, looking for some evidence of similarly situated. It found a reference to four employees, two of whom were about the same age as the plaintiff, and although there was a reference in the deposition to two younger employees who were using their cell phones in the plant, that doesn't make them similarly situated because there's no rule against just using your cell phone in the plant. There's no evidence that they used their cell phones in the plant in any manner that would have violated the rules or that came to the supervisor's attention. The overall claim that Mr. Howard was out to get plaintiff due to his age also makes very little sense here in the sense that there's no similarly situated person treated any differently. There are these other material handlers, co-workers of plaintiff who are about the same age. No evidence they were treated badly. And the claim, again, that Mr. Howard was out to retaliate also doesn't make a lot of sense here in the overall context of the record because there's no evidence that Mr. Howard was ever aware of any age-related protected activity. The plaintiff goes on and on about how he complained about overtime allocations to Mr. Pekarik, but there's no evidence linking that to Mr. Howard who gave the suspension for the cell phone. The plaintiff also complained about sweeping assignment violating the ADEA. It also fails in the merits. The district court correctly held that assigning sweeping duties is not an adverse action. Not only did Mr. Howard have general maintenance duties, which included sweeping, but he received exactly the same pay and benefits while assigned to his sweeping duties. So plaintiff argues on appeal, well, he was humiliated by the sweeping duties. That runs back up into a problem for the plaintiff, which is the ADEA does not authorize emotional distress damages, including for humiliation. So essentially that in and of itself would mean that there is no actionable cause for the sweeping duties. Again, there's no identification of similarly situated employees, and not as only is there no evidence that it was motivated by age discrimination and retaliation. To the contrary, on page 5 of Plaintiff's reply brief, plaintiff seems himself to attribute the sweeping assignment to an entirely different motive that has nothing to do with age. He says this was Mr. Howard punishing him essentially for showing him up after Mr. Howard took plaintiff to medical when Mr. Howard, in response to an unusual forklift assignment, said, I can't use that kind of forklift because it hurts me. So he took him to medical, and then plaintiff got medical clearance. Well, it's undisputed that those unusual forklift assignments that day were unusual for everyone. So it's not age-related, and yet he's now attributed that as the motive for that assignment. So on top of everything else, that claim also fails. Again, can't be retaliation again because there's no evidence showing that Mr. Howard even knew of age-related protected activity. And as plaintiff conceded at the beginning of his argument, he has not pursued his workers' compensation appeal in this court or his workers' compensation claim in this court. And so Progress Rail would ask, if there are no other questions, Progress Rail would ask that the district court's order entering summary judgment in favor of Progress Rail and against the plaintiff be affirmed in all aspects. Thank you. Thank you. I'll give you 30 seconds, Mr. Schweeney, if you had one point you want to end on or a thought you want to leave us with. Thank you, Your Honor. Under the Ortiz approach, this court must take a look at and the district court must take a look at the overall context of the situation. There is not supposed to be a mechanistic, ritualistic means by which we have to say, okay, in this situation you don't have this, so you can't pursue this claim. When one does that, doesn't break this up into compartmentalized vignettes and say, was that one part of retaliation or not? I think the court would find that this was actionable. We would ask that the district court's decision with respect to age discrimination retaliation be reversed. Thank you very much. Thanks to both counsel. The case is submitted.